# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                            No.   CR 12-163 MCA

GAVIN YEPA,

      Defendant.

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

COMES NOW the Defendant, Gavin Yepa, by and through his counsel of record Devon M. Fooks and Brian A. Pori, and pursuant to 18 U.S.C. § 3553, and the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, to respectfully request that this Honorable Court impose a just reasonable sentence of thirty years in the custody of the United States Bureau of Prisons.  In particular, Mr. Yepa contends that the mandatory sentence of life set out in 18 U.S.C. §§ 1153 and 1111violates the separation of powers and amounts to a cruel and unusual punishment given the tragic facts of this case.  Mr. Yepa also objects to an enhancement for restraint of the victim under Section 3A1.3 of the United States Sentencing Guideline.  Finally, Mr. Yepa requests that, in light

of Sections 5H1.4 (Physical Condition Including Drug and Alcohol Dependence)

5H1.6 (family ties and responsibilities), 5H1.12 (Lack of Guidance as a Youth)

5K2.16 (Voluntary Disclosure of the Offense) 5K2.20 (aberrant behavior) and

5K2.0 (factors not adequately considered by the Sentencing Commission), that this

Honorable Court depart or vary from the statutory and recommended Guideline

sentence of life to a sentence of thirty years.

### *Objections to the Pre-Sentence Report*

Mr. Yepa objects to the following paragraphs in the Pre Sentence

Investigation Report:

Paragraph 8 –  Mr. Yepa objects to the allegation that he did not appear to

be intoxicated when he was in the Giant Gasoline and Convenience Store on the

night of December 28, 2011.  Mr. Yepa contends that video from the store clearly

shows that Mr. Yepa was obviously intoxicated.

Paragraph 9 – Mr. Yepa objects to the failure to note in Paragraph 9 that Mr.

Yepa told Ms. Doe that she should leave with Louana Toledo.

Paragraph 30 – Mr. Yepa objects to the failure of Paragraph 30 to include a

retrograde analysis of Mr. Yepa's blood alcohol level.  Indeed, as FBI Chemist

Madeline Montgomery determined, Mr. Yepa could have had a blood alcohol level

of .27 at the time of the offense.

Paragraph 31 – Mr. Yepa objects to the factual allegations in Paragraph 31 because the Pre-Sentence Report fails to note that Mr. Yepa only made statements to former Jemez Chief of Police Mike Toya, in Towa, following a custodial interrogation by Chief Toya after Mr. Yepa had clearly and unequivocally invoked his right to remain silent and requested the assistance of counsel during in-custody questioning by FBI Special Agent Benedict Bourgeois.

Paragraph 52 – Mr. Yepa seeks to correct the Defendant's version of the events to correct an inadvertent error by his counsel in drafting the statement.  On page 17, line 4 of the Pre-Sentence Report the words "living room" should be changed to "back room."

Paragraph 67 – Mr. Yepa objects to an enhancement under section 3A1.3 of the Guidelines because there is no evidence to suggest that the victim was physically restrained during the course of the offense.

Paragraph 101 – Mr. Yepa objects to the final sentence of Paragraph 101 because he did not "continue" to drink to excess after leaving the Santa Fe Recovery Program.  Instead, as indicated in his Mr. Yepa's Version of the Events contained in Paragraph 52 of the Pre-sentence Report, Mr. Yepa maintained his consistently maintained his sobriety following his discharge from in-patient treatment until December 26, 2011.

<u>Paragraph 119</u> – Mr. Yepa respectfully submits that, under the unique circumstances of this case, a mandatory sentence of life in prison amounts to cruel and unusual punishment and violates the Constitutional command for the separation of powers.

### *Statement of Facts*

Gavin Yepa was born and raised in the Jemez Pueblo.  Following an idyllic childhood (PSR ¶¶ 91 and 92), Mr. Yepa's parents separated when he was twelve or thirteen years old and Mr. Yepa was left to live on his own.  (PSR ¶ 93.)

Mr. Yepa has a long, sad, documented history of drug and alcohol abuse. (PSR ¶¶ 98, 101-107.)  Mr. Yepa's addiction to drugs and alcohol began when he was only eleven years old and continued unabated until the date of this offense, interrupted only by the birth of his son, Javin, and his fitful efforts at recovery.

Despite his chronic substance abuse, Mr. Yepa has been steadily employed since 2004.  (PSR ¶¶ 112-116.)  More important, following his separation from his wife Jamie, Mr. Yepa was the primary care-taker for his son Javin and he was, by all accounts, a loving and devoted father.  In addition, Mr. Yepa was a regular guardian to his developmentally disabled cousin, Bryson.[1]

---

[1]  Mr. Yepa incorporates the pleadings, records and files of this action in the Sentencing Memorandum and, in particular, relies on the information and evidence provided in the following documents: (1) The Psychological Report Received as to Gavin Yepa (Doc. 20); (2) Defendant's

Just before midnight on December 28, 2011, Gavin Yepa ran to the home of Clint Sando and reported that there was a woman in his home who had stopped breathing.  Mr. Sando and Mr. Yepa ran back to Mr. Yepa's house and discovered a seriously injured Jane Doe bleeding to death in Mr. Yepa's son Javin's room. Other tribal officials responded to the scene and asked Mr. Yepa what had happened.  In response, Mr. Yepa told the officials that he had passed out from drinking and that when he woke up he found Jane Doe, tried to help her, and then went for help.

Mr. Yepa's home was in an odd state.  It appeared that someone had tried to barricade the back door and then sweep up evidence of the crime.  The back bedroom also showed evidence of someone who had made a path from Jane Doe's body to the bed and out the door, discarding bloody tennis shoes along the way.

Mr. Yepa was arrested.  While waiting for the FBI to respond to the scene, Mr. Yepa spoke with his cousin, tribal official Vincent Madalena, in Towa and explained that he would tell his cousin everything he knew.  Officer Madalena offered to take a tape recorded statement from Mr. Yepa, but the then Chief of

---

Notice of Objections to Government's Proffered Exhibits (Doc. 93); (3) Defendant's Supplemental Objections to Exhibits 194 and 196 (Doc. 122); (4) Defendant's Opposed Motion and Reply for Release from Custody (Doc. 143, 146 [and attached exhibits]); and (5) Defendant's Opposed Motion and Reply for Release from Custody (Doc. 218, 223 [and attached exhibits]);

Case 1:12-cr-00163-MCA   Document 297   Filed 02/11/16   Page 6 of 22

Police of the Jemez Police Department, Mike Toya, instructed Officer Madalena to wait until the FBI responded to the scene.

About three hours after he was arrested, FBI Special Agent Benedict Bourgeois arrived in the Jemez Pueblo and attempted to take a statement from Mr. Yepa.  Mr. Yepa consistently responded to Special Agent Bourgeois' efforts to question him by passionately and vociferously invoking his right to remain silent and requesting the assistance of a lawyer.  Undeterred, Agent Bourgeois persisted in his efforts to question Mr. Yepa until Mr. Yepa broke down sobbing and stated:

> Don't you know I had a dead body in my fucking house?  What do you expect me to fucking do?  Go to f----ing jail for it?  God damn it man, there's a f—ing dead a– body in my house just a minute ago and now I'm going to jail for it and you expect me to talk about it?  What the f—? I don't know what the f— happened man.  I don't even know the f—ing chick. Now I'm f----ing going to jail.  I have a six year-old son.  My mom don't even f—ing know.  Caution tape around my f—ing house and some strangers trying to talk to me. . . . F— you man.  What the f—. . . .Do I look like a f—ing killer to you. . . . There's a dead body in my house.  I ran through the f—ing neighborhood, I would have run away. . . I'm not going to kill no f---ing chick that I don't know f—ing know. . . I didn't do s–t man.  You don't even f—ing talk to me." (Doc. 122, pp. 5-6)

More than 24 hours after Jane Doe was brutally murdered, a belligerent, intoxicated and combative Rodney Adams arrived at the Jemez Police Department and told Officer Gary Tafoya that he had information about the murder.  During the course of a subsequent interview, Mr. Adams admitted that he was present in

Mr. Yepa's home on the night of the murder and that he saw Jane Doe is obvious

distress, but did nothing.  Instead, Mr. Adams admitted that he robbed Jane Doe of

her phone and her food stamps electronic benefits card and that, when he left Mr.

Yepa's home, rather than call for help he used Jane Doe's phone to call and check

the balance on the EBT card.  Mr. Adams faced no sanction for his criminal

behavior and was instead given immunity to testify against Mr. Yepa.

### *Argument*

The abiding  principle throughout the judicial history of our country is that

the sentencing judge should "consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify the crime and punishment."  *Koon v. United States,* 518 U.S.

81, 113 (1996).  Therefore, every sentence in a criminal case must be both just and

reasonable based on a fair interpretation of the United States Sentencing

Guidelines and a full assessment of the statutory factors delineated in 18 U.S.C. §

3553(a).  *United States v. Kristl,* 437 F.3d 1050, 1053 (10th Cir. 2006), see also

*United States v. Contreras-Martinez,* 409 F.3d 1236, 1241 (10th Cir. 2005).

Ultimately the sentence in every criminal case must be "sufficient, but not greater

than necessary" to fulfill the sentencing aims established by Congress.  *United*

*States v. Mateo,* 471 F.3d 1162, 1163 (10th Cir. 2006).

Mr. Yepa objects to the mandatory sentence of life set out in 18 U.S.C. §

1111 because it is excessive and disproportionate in light of the sad and tragic

facts surrounding this case.  In addition, Mr. Yepa contends that he should not be

subjected to an enhancement for the restraint of the victim under section 3A1.3 of

the United States Sentencing Guideline.  Finally Mr. Yepa respectfully submits

that this Honorable Court should depart or vary from the mandatory sentence of

life set out in  18 U.S.C. § 1111 because of his family ties, his lack of guidance as

a youth, his voluntary disclosure of the offense, the fact that this alleged offense

was utterly aberrant, and because of other factors which have not been fully

considered by the United States Sentencing Guidelines.

## I.   THE MANDATORY SENTENCE OF LIFE IS A DISPROPORTIONALLY CRUEL AND USUAL SENTENCE AND VIOLATES THE SEPARATION OF POWERS.

Mr. Yepa contends that the mandatory sentence of life for the offense of

murder set out in 18 U.S.C. § 1111 is unconstitutionally cruel and unusual and is

grossly disproportionate to the charged crime as applied to the unique and tragic

facts in this case.  Mr. Yepa also contends that this mandatory sentence violates

the separation of powers and usurps this Honorable Court's constitutional function

to impose a just a reasonable sentence based on a full and fair consideration of the

sentencing factors set out in 18 U.S.C. § 3553.

Mandatory sentences may violate the United States Constitution in multiple ways.  First, the Due Process Clause of the Fifth Amendment demands that congressional sentencing schemes – including mandatory sentences – must satisfy constitutional standards of rationality and cannot be based on arbitrary or fanciful distinctions.  Cf. U.S. Const. Amend. V, see also *United States v. Polizzi,* 549 F.Supp.2d 308, 372 (E.D.N.Y. 2008), see also *Chapman v. United States,* 500 U.S. 453, 465 (1991).  Next the constitutional command for the separation of powers may prevent the Congress from criminalizing and punishing citizens unilaterally without regard to the judiciary's unique function in fashioning just and reasonable criminal sentences.  See U.S. Constitution, Articles I through III.  Finally mandatory sentences may violate the Eighth Amendment because the sentence may result in a cruel and unusual punishment as applied in a individual case, may prohibit District Courts from considering any mitigating evidence offered by the Defendant, and could result in a prison sentence which is utterly disproportionate to the charged crime.  See, e.g., *Harmelin v. Michigan,* 501 U.S.  957, 1001 (1991); *Ewing v. California,* 538 U.S. 11 (2003); *Lockett v. Ohio,* 438 U.S. 586, 604 (1978).

Mr. Yepa respectfully submits that this Honorable Court would be justified in imposing a sentence less than the mandatory sentence of life because a life

sentence would be unjust, unreasonable and far more severe than necessary to achieve the sentencing aims established by Congress.  18 U.S.C. § 3553, subd. (a). In particular, Mr. Yepa contends that this Honorable Court should reject a life sentence because: (1) as applied to Mr. Yepa, a term of imprisonment for life would be cruel and unusual punishment because it would be disproportionate to the charged crime and it would prevent this Honorable Court from considering the mitigating evidence offered by Mr. Yepa; and (2) the mandatory sentence of life violates the separation of powers because Congress has usurped this Honorable Court's Article III jurisdiction to impose a just sentence after a fair consideration of all relevant mitigating circumstances.

### A.    A Sentence of Life is a Cruel and Unusual Punishment Because it is Disproportionate to the Charged Offense.

Mr. Yepa contends that the mandatory sentence of life for murder amounts to cruel and unusual punishment as applied to the facts of this case because of the unique circumstances surrounding this offense.  Moreover, Mr. Yepa contends that this "one-size-fits-all" sentence flatly prevents this Honorable Court from any meaningful consideration of the unique facts and mitigating circumstances which are present here, in violation of both the Eighth Amendment and 18 U.S.C. §§ 3553.

The Eighth Amendment requires proportionality between the sentences imposed and the facts of the case. *Lockyer v. Andrade*, 538 U.S. 63, 76, see also *Solem v. Helm,* 463 U.S. 277. Sentences that are "grossly disproportionate" to the charged crime are unconstitutional. *Harmelin v. Michigan, supra,* 501 U.S. at 1001. A court may redress this constitutional violation by exercising its own independent judgment to fashion a just punishment in an individual case. *Roper v. Simmons,* 543 U.S. 551 (2005), see also *United States v. C.R.,* 792 F.Supp.2d 343, 493-494 (E.D.N.Y. 2011).

In determining whether the mandatory sentence required by a Congressional statute is, as applied, cruel and unusual punishment, "the question is whether the statute would be unconstitutional if applied literally to the facts of the case." *United States v. Polouizzi,* 697 F.Supp.2d 381, 387 (E.D.N.Y. 2010.) Factual context and the defendant's unique circumstances are critical to this assessment. *Id,* see also *United States v. C.R.* 792 F.Supp.2d at 509, but see *United States v. Cunningham,* 191 Fed.Appx. 670, 674 (10th Cir. 2006) [trial court did not violate the Eighth Amendment when the Court imposed a mandatory sentence].

Despite the horrific facts attendant to the death of Jane Doe, Mr. Yepa nonetheless respectfully submits that the Eighth Amendment will not sanction the imposition of a mandatory sentence of life. Mr. Yepa contends that, as applied to

the facts of this case, a mandatory sentence of life would be cruel and unusual punishment because it is grossly disproportionate to the offense in light of the role another person, Rodney Adams, may have played in the death of Jane Doe and because it will prevent this Honorable Court from considering the mitigating evidence that Mr. Yepa went for help while Mr. Adams fled the scene.

As reflected in the testimony and evidence adduced at trial, at least two people (besides Jane Doe) were present in Mr. Yepa's home on the night Jane Doe died – Mr. Yepa and Rodney Adams.  As reflected by the physical evidence, one person tried to clean the house and destroy evidence and one person immediately went for help as soon as he realized what was happening.  One person saw Jane Doe in obvious distress and did nothing, and one person reported the crime to the police immediately after he discovered it.  One person fled the scene and never submitted to a timely examination of his body and clothing, the other person cooperate in the timely collection of evidence.  One person failed to disclose his knowledge of the offense for more than 24 hours after the gruesome murder and one person told tribal official Vincent Magdalena that he would tell him everything that he knew within an hour of the offense.  And now one person avoids any punishment for any of the crimes he committed on the night of December 28, 2011 while the other faces a sentence of life in prison.  Under these

circumstances, the sentence of life for Mr. Yepa is grossly disproportionate, especially in light of the unwarranted sentencing disparities between Mr. Yepa and Mr. Adams.

>    **B.**    **A Mandatory Sentence of Life Violates the Separation of Powers By Allowing Both Congress and the Executive Branch to Divest the Judiciary of its Essential Discretion to Impose a Just and Reasonable Sentence in all Criminal Cases.**

Beginning in the early 1980s with the enactment of the Sentencing Reform Act and the Armed Career Criminal Act, Congress embarked on a novel criminal sentencing regime which included a variety of mandatory sentences for certain offenses.  These mandatory sentences ultimately divest federal judges of the sentencing discretion which the judiciary has enjoyed in one form or another since before the drafting of the Constitution.  K Riley, *Trial by Legislature: Why Statutory Mandatory Minimum Sentences Violate the Separation of Powers Doctrine*, 19 BUPILJ 285, 293 (Spring 2010).  With the enactment of these mandatory sentences, the Legislature has improperly usurped power traditionally vested in the judiciary and allowed the executive branch to wield improper authority to impose or moderate the mandatory punishment.  The result violates the separation of powers because it relegates the judiciary to the status of a bureaucratic functionary, denied the essential discretion required to impose a

reasonable sentence in every criminal case.  *Id.* at 303.

In 2005 the Supreme Court decided the landmark case of *United States v. Booker*, 543 U.S. 220 (2005) and ruled that the United States Sentencing Guidelines were unconstitutional due to their mandatory nature.  Although the Supreme Court based its holding in *Booker* on the Sixth Amendment right to a trial by a jury, there is a strong implication that the separation of powers doctrine was also at work and reinforced the Court's essential concern to maintain judicial discretion as an essential element in criminal sentencings.  Susan F. Mandiberg, *Why Sentencing by a Judge Satisfies the Right to Jury Trial: A comparative Law Look at Blakely and Booker,* 40 McGeorge L. Rev. 107, 138 (2009).  In *Booker* the Supreme Court reiterated that a fair sentencing system "depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime."  *United States v. Booker, supra,* 543 U.S. at 250.

When judges are forced by law to impose a certain sentence, they lose the ability to effectively consider the individual facts and conduct underlying each crime and they are divested of any ability to determine whether there are any mitigating circumstances which would justify a sentence less than the mandatory sentence.  Such a regime deprives the judiciary of its basic constitutional function, in violation of the separation of powers.  K. Riley, *Trial by Legislature,* 19 Boston

Univ. Public Int. L. J. at 301, but see *Chapman v. United Staes, supra,* 500 U.S. at 467 ("the authority to define and fix the punishment for crime is legislative [and] the right to relieve from the punishment fixed by law . . .belongs to the executive branch").[2]

The Legislature is not the only branch of Government which invades the province of the judiciary through the application of mandatory sentences. Another vice of mandatory sentences is the unlimited discretion afforded to the Executive Branch to enforce or not enforce these sentences. As a result, the prosecutor is able to ameliorate some of the effects of a mandatory sentence through its charging power, thereby shifting sentencing discretion from the judge to the prosecutor. *Ibid.* This shift plainly shows that the mandatory sentences imposed by Legislative fiat ultimately invade the traditional province of the judge and jury and violate the separation of powers. See, e.g., *United States v. Polizzi, supra,* 549 F.Supp.2d at 397-398, but see *United States v. Byrd*, 379 Fed.Appx.84 (2nd Cir.

---

[2] Judges, legal scholars and community activists have expressed increasing concern over the rigid application of mandatory sentences. For example, in a recent survey of judges conducted by the United States Sentencing Commission, sixty two percent of the judges surveyed said that the required sentences were generally too high across all cases involving mandatory sentences. *United States v. C.R., supra,* 792 F.Supp.2d at 484. Subsequent hearings before the United States Sentencing Commission reinforced this perception and highlighted "the inequity, injustice and inefficacy of mandatory [] sentence[s]." *Id.* at 485.

2010) (upholding a mandatory minimum sentence for the use of a firearm); *United States v. Valencia-Gonzales,* 172 F.3d 344, 345-346 (5th Cir. 1999) (upholding mandatory minimum sentence in a drug case); *United States v. Cunningham, supra,* 191 Fed.Appx. 670.

Mr. Yepa contends that a mandatory sentence of life in this case violates the separation of powers.  While the prosecution has the discretion to offer a sentence of less than life as part of its plea bargaining power (for example by agreeing to a reduced sentence of second degree murder based on a defense of voluntary intoxication) and the Legislature has the power to set a lesser-sentence for a lesser degree of crime (i.e. first degree murder versus second degree murder) the Court in this case is nonetheless utterly constrained from imposing any sentence less than life, even if this Honorable Court is convinced that a life sentence is more severe than necessary to reflect the seriousness of the offense, to promote respect for the law or to provide just punishment.  Cf. 18 U.S.C. § 3553, subd. (a)(2)(A).  This effort to hamstring the judiciary violates the constitutional command for a separation of powers.

## II.    MR. YEPA SHOULD NOT RECEIVE A SENTENCE ENHANCEMENT FOR THE RESTRAINT OF THE VICTIM.

The Pre-Sentence Investigation Report has erred in recommending a two

level increase under United States Sentencing Guideline Section 3A1.3 for the restraint of the victim.  The PSR has incorrectly applied this enhancement because there is simply no factual basis for the two-level increase.

Section 3A1.3 of the United States Sentencing Guidelines provides for a two-level increase in the offense level "if a victim was physically restrained in the course of the offense."  However, the enhancement cannot apply to "an act that necessarily overlaps and is indistinct from the act that constituted the base offense" without violating the Fifth Amendment prohibition on multiple punishments.  *United States v. Apodaca,* 147 Fed.Appx. 735, 737 (10th Cir. 2005), citing *United States v. Halper,* 490 U.S. 435, 440 (1989).

Under the Guidelines, "physically restrained" means the forcible restraint of the victim such as "by being tied, bound or locked up."  USSG §1B1.1, comment, note 1(K).  While the examples set out in the Guidelines are illustrative and not exclusive, the Guidelines nevertheless require some level of force or restriction of movement beyond that which is required to commit the crime.  *United States v. Roberts,* 898 F.2d 1465, 1470 (10th Cir. 1990) [victim held around the neck at knife point denied freedom of movement].

Virtually every sexual assault involves some level of physical force which impedes movement; therefore the physical restraint enhancement cannot be

defined "so inclusively [as] to increase the Guidelines' base level . . . in the considerable majority of cases." *United States v. Anglin,* 169 F.3d 154, 165 (2nd Cir. 1999). Instead, in crafting a two-level enhancement for the forcible restraint of a victim, "the Sentencing Commission contemplated a more narrow set of circumstances." *Ibid, see also United States v. Mikalajunas,* 936 F.2d 153 (4th Cir. 1991) [enhancement of offense level for physical restraint requires something beyond acts which are part and parcel of the crime]; *United States v. Lilly,* 285 F.Supp.2d 737, 741 (S.D.W.Va. 2003) [displaying a weapon and controlling movement for a short period does not constitute physical restraint].

Under the Guidelines, physical restraint occurs only when a victim is specifically prevented from moving in order to facilitate the crime. *United States v. Miera,* 539 F.3d 1232, 1234 (10th Cir. 2008). Consequently, "cases holding that a defendant physically restrained his victim usually involve a *sustained focus* on the restrained person that lasts long enough for the [perpetrator] to direct the victim into a room or order the victim to walk somewhere." *United States v. Parker,* 241 F.3d 1114, 1118 (9th Cir. 2001) (emphasis in the original), *see also United States v. Carter,* 410 F.3d 942, 954 (7th Cir. 2005) [moving bank teller from the vault to the teller drawer]; *United States v. Nelson,* 137 F.3d 1094, 1112 (9th Cir. 1998) [ordering a jewelry store employee to the back room at gun point].

-18-

Mr. Yepa objects to the enhancement for the restraint of any victim in this case.  There is simply no evidence that Mr. Yepa, or anyone else, ever subjected Jane Doe to a sustained period of restraint or movement beyond the forcible acts which were required to commit the charged offense.  Therefore the proposed enhancement simply does not apply.

### III.   THIS HONORABLE COURT SHOULD DEPART OR VARY FROM THE SENTENCE RECOMMENDED BY THE UNITED STATES SENTENCING GUIDELINES.

In  *United States v. Booker,* 543 U.S. 220 (2005) the United States Supreme Court held that 18 U.S.C. § 3553(a) requires a court to impose a sentence sufficient, but not greater than necessary to comply with the four purposes of sentencing set forth in Section 3553(a)(2):  retribution, deterrence, incapacitation, and rehabilitation.  This provision is not just another "factor" to be considered along with the other factors set forth in § 3553(a); this "parsimony clause" sets an independent limit on the sentence a court may impose.  The Supreme Court reiterated in *Kimbrough v. United States,* 552 U.S. 85 (2007) that the District Court's job is "appropriately [to] frame[] its final determination in line with § 3553(a)'s overarching instruction 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." 552 U.S. at 111.

Clearly, the sentencing equation post-*Booker* requires consideration of matters outside the scope of the guidelines.

> The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual §§ 5H1.1-6, 11, and 12 (Nov.2006). These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. See, *e.g.,* 18 U.S.C. § 3553(a)(1). As such, they are factors that an appellate court must consider under *Booker's* abuse-of-discretion standard.

*Rita v. United States*, 551 U.S. 338, 365 (2007), (Stevens, J., concurring) (footnote omitted).

Justice Stevens also noted that, since *Booker*, many district judges seemed to treat the "advisory" guidelines as effectively mandatory. *See Rita*, 551 U.S. at 366 (Stevens, J., concurring) (*quoting United States v. Pruitt,* 502 F.3d 1154, 1166 (10th Cir. 2007), *vacated in light of Gall*, 552 U.S. 38, 128 S.Ct. 586 (2007) (McConnell, J., concurring) ("after watching [the various Courts of Appeal after *Booker*]…, it seems to me that the rebuttability of the presumption is more theoretical than real."). Justice Stevens went on to express his belief in the effect of *Rita* in this connection: "Our decision today makes clear, however, that the

rebuttability of the presumption is real.  . . .  Given the clarity of our holding, I trust that those judges who had treated the Guidelines as virtually mandatory during the post-*Booker* interregnum will now recognize that the Guidelines are truly advisory."  *Rita*, 551 U.S. at 367 (Stevens, J., concurring).

Mr. Yepa contends that a full and fair consideration of the sentencing factors set forth in 18 U.S.C. § 3553 and the appropriate grounds for departure set out in the United States Sentencing Guidelines should compel this Honorable Court to depart or vary from the mandatory sentence (and the recommended Guideline sentence) of life.  In particular, Mr. Yepa respectfully submits that in light of his history and characteristics, his family ties, his lack of guidance as a youth, his chronic drug and alcohol addiction, his utterly aberrant behavior and other factors set out in both the Pre-Sentence Report (¶¶ 87-116) and the United States Sentencing Guidelines, this Honorable Court should depart or vary to a sentence of thirty years in prison.

WHEREFORE, for all of the foregoing reasons, Defendant Gavin Yepa respectfully requests that this Honorable Court impose a sentence of thirty years in the custody of the United States Bureau of Prisons for the offense in this case.

Respectfully Submitted,

By:/s/ *Brian A. Pori* Submitted Electronically 2/11/16
        Brian A. Pori
        Devon M. Fooks
        Assistant Federal Public Defenders
        111 Lomas Blvd. NW, Suite 501
        Albuquerque, New Mexico 87102
        (505) 346-2489

        Counsel for Gavin Yepa

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February, 2016, I filed this

Defendant's Sentencing Memorandum by CM/ECF electronic filing which caused

a copy of the pleading to be delivered on counsel for the United States at the

address listed below:

Nikki Tapia-Brito, Esq.
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM  87103

        /s/ *Brian A. Pori* Submitted Electronically 2/11/16
        Brian A. Pori